Norman **FORD**, Appellant,

v.

**STATE** of Indiana, Appellee.

No. 71S00–8902–CR–168.

Supreme Court of Indiana.

June 27, 1990.

James F. Korpal, South Bend, for appellant.

Linley E. Pearson, Atty. Gen. and Richard C. Webster, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Norman Ford appeals his convictions of Rape and Criminal Deviate Conduct, both Class A felonies. Ford received two forty (40) year sentences to be served concurrently. Ford also appeals the trial court's finding him to be an habitual offender, for which he received an enhancement of thirty (30) years for a total sentence of seventy (70) years.

Ford presents three issues for our review, as follows:

1. whether the trial court erred in giving the State's Instruction No. 19 on flight to the jury;

2. whether the trial court erred in denying Ford's Motion for Mistrial based on the trial court's allegedly improper remarks to the jury prior to the habitual offender proceeding; and

3. sufficiency of the evidence regarding Ford's rape and criminal deviate conduct convictions and whether the jury's verdict was contrary to law.

The facts most favorable to the verdict show that in the early morning hours of April 11, 1988, the victim, J.T., was awakened in her bedroom by Ford's hand over her face. J.T. asked Ford what he wanted and he told her to shut up and be quiet. She then asked him who he was and what was he there for. Ford threatened that if she did not stay quiet, he would kill her and her friend in the next room with the sawed-off shotgun he had with him. Ford told J.T. that he had seen her and wanted her. He told her he knew her name, where she worked and where she lived. Ford also stated he knew J.T. had roommates and he also knew how to get to her apartment when she would be home. Ford then proceeded to tie a bandanna around J.T.'s eyes and rape her. Thereafter, J.T. asked if she could take a shower. Ford let her shower, but stood outside the door. J.T. replaced the bandanna over her eyes after the shower, and walked back to her bedroom with Ford. Ford raped her again and performed cunnilingus. J.T. was able to slip up the bandanna and see Ford's face, his build and what he looked like. The bedroom was illuminated by a streetlight and the moonlight shining through a window. Ford left J.T.'s apartment approximately one and one-half (1½) to two (2) hours after the victim showered. Before he left, Ford told J.T. that he would see her again and warned her that if she ever told anyone what had happened, he would find out about it and return to hurt her. J.T. did not call the police that night because Ford had cut the telephone line; moreover, she was afraid of Ford's previous threats. She fell asleep after Ford left.

The following Wednesday, April 13, 1988, J.T. was in her kitchen doing the dishes when Ford suddenly appeared at the kitchen window. Startled, J.T. went to her roommates and told them of the rape. She then called the police, as one of her roommates had replaced the severed telephone cord by this time. J.T.'s roommates, both young men, grabbed golf clubs out of their closet and went around the perimeter of the apartment complex. The police arrived, and Patrolman Brian Young chased a suspect on foot a distance of approximately one-half (½) mile. Patrolman Young did not see the suspect's face, only a silhouette. He chased the suspect through some back yards and observed the suspect go over several chain-link fences, approximately four feet high, with spiked prongs on top. Young saw the suspect place his hand on the top of these fences to pull his weight over in one continuous motion and keep on running. Young was unable to apprehend him. In the meantime, J.T. gave police detectives her statement about the rape that occurred two nights before.

Two days later, J.T. arrived at her job at the Olive Garden Restaurant at about 10:30 a.m. She received a message that Ford had called and would call back later that day. Ford subsequently called J.T. and asked her why she had called the police on Wednesday. J.T. denied calling the police and told Ford her roommates had seen him and made the call. J.T. told Ford to call her at home that afternoon. She then called Lt. Samp of the Mishawaka police, who met her at her apartment later that afternoon. When Ford called, Lt. Samp tape-recorded the conversation. J.T. told Ford she would meet him at an Azar's Restaurant that evening.

J.T. went to the restaurant to meet Ford. The police were present as surveillance both inside and outside the restaurant. Ford arrived and sat and talked with J.T. for approximately twenty minutes. J.T. noticed a bandage on Ford's hand and he told her he had injured it while running from the police on Wednesday night. J.T. suggested they go elsewhere. While exiting the restaurant, Ford was apprehended and placed under arrest.

Ford was charged by information with robbery, rape and criminal deviate conduct. The State later amended the charges before trial by adding an habitual offender count.

## I.

▮▮▮ Ford's first contention is that the trial court erred in giving the State's tendered instruction on flight to the jury.

Ford admits that the challenged instruction is a proper statement of the law; his sole contention is that it was not supported by sufficient evidence. This issue has been waived because Ford failed to preserve his objection in the record of proceedings and did not cite the verbatim objection in his appellate brief as required by Ind.R.App.P. 8.3(A)(7). An examination of the record indicates that the arguments of counsel regarding final instructions were not transcribed. Nevertheless, Ford could have prepared a statement of the proceedings, submitted it to the trial court for settlement and approval, and included it in the record pursuant to Ind.R.App.P. 7.2(A)(3)(c). This was not done. The alleged error is therefore waived and we will not consider it. *Norris v. State* (1986), Ind., 498 N.E.2d 1203, 1206. We do note, however, that there was sufficient evidence that Ford successfully fled from police officers and avoided arrest when they were summoned to J.T.'s apartment complex on Wednesday, April 13, 1988. Even Ford admitted at trial that he ran when the police came. The jury was properly instructed that it could consider Ford's successful efforts at avoiding arrest as evidence of his guilt, even though this flight occurred two days after the crime. *See Potter v. State* (1983), Ind., 451 N.E.2d 1080, 1081 (evidence of flight in stolen vehicle three days after car stolen sufficient to support flight instruction).

## II.

■ Next, Ford maintains that the trial court erred in denying his Motion for Mistrial for certain alleged extra-judicial comments made to the jury before the habitual offender stage of the proceedings. These comments referred to Ford's prior admission on cross-examination that he had been previously convicted of burglary in 1973 and rape in 1978. After the jury returned its verdict on the underlying charges, the trial court stated the following:

> Ladies and Gentlemen of the jury, normally at this time I would talk to you very briefly about the duties of jurors and thank you for your service and excuse you from the jury. In this particular case there was something that the [c]ourt was not able to inform you of until the present time; that is that the State has filed an information Count 4 called Habitual Offender. *I'm not going to read it to you word for word at this time, but basically it informs you of something that you learned during the trial,* and the State alleges that on or about June 18, 1973 in Maricopa County, Arizona that Mr. Ford was convicted of a crime of burglary, second-degree, a felony, and that after that time he was sentenced to a term of imprisonment in that state and was placed on probation. Then, secondly, that on December 7, 1978 in Marion County, Indiana he was convicted of the crime of rape, a Class B felony, and that he was sentenced by the [c]ourt in Marion County on that particular crime.

*Record* at 260–61 (emphasis added). Ford made a timely objection and moved for a mistrial, contending that the trial court's statement, emphasized above, was a prejudicial comment on evidence that had not been presented to the jury on the State's habitual offender charge, the second part of this bifurcated proceeding.

■ The granting of a mistrial lies within the sound discretion of the trial court and its determination will be reversed only where an abuse of that discretion can be established. *Pitman v. State* (1989), Ind., 547 N.E.2d 805, 808. To prevail, Ford must demonstrate he was placed in a position of grave peril to which he should not have been subjected. *Id.* The trial court stated it was about to tell the jury something that it could not have mentioned before and then went on to say that the State's habitual offender charge basically informed the jury of something they learned about during the trial. This simple matter of fact was not an improper commentary on the evidence nor did it subject Ford to great peril. When Ford took the stand in his own defense on the underlying charges, he admitted that he had been convicted of the two prior felonies set forth in the State's habitual offender charge. In fact, before he took the stand in his own defense, the

trial court admonished Ford that the prosecutor may very well ask him on the record and in front of the jury whether he had certain felony convictions in the past. Ford replied that he understood and proceeded to take the stand in his own defense.

During the habitual offender phase of trial, State's Exhibits 4–6 were admitted to establish appellant's prior felony convictions of burglary in 1973 and rape in 1978. Exhibit 4, admitted over Ford's objection, was a transcript of Ford's prior admissions at trial of these felony convictions. Exhibit 5 contained copies of court docket sheets properly certified as proof of Ford's burglary conviction on June 18, 1973, in the superior court of Maricopa County, Arizona. Exhibit 6 included certified copies of Ford's photograph and fingerprints, as well as Ford's commitment paper from the Westville Correctional Center, as proof of his December 7, 1978, rape conviction in the criminal court of Marion County, Indiana. Given Ford's admission under oath with regard to these prior felonies, and the properly certified documents underlying each, we cannot say that the trial court's comments as set forth above subjected Ford to grave peril warranting a mistrial. See McVey v. State (1988), Ind., 531 N.E.2d 458, 460–61; Trice v. State (1986), Ind., 490 N.E.2d 757, 760.

The trial court did not err in denying Ford's Motion for Mistrial on the habitual offender count.

### III.

■ Finally, Ford argues that there was insufficient evidence to support the jury's verdict that he was guilty of rape and criminal deviate conduct. His version of what happened is based solely on his own testimony. Ford testified that he had been introduced to J.T. at O'Tays dance club the Friday night before the alleged rape took place. He was interested in purchasing some cocaine on credit, and a mutual acquaintance introduced them and later gave Ford her telephone number. Ford called her the next morning and J.T. told him that she did not want to speak on the telephone, but would prefer to meet him at her apartment. Ford went to her apartment at approximately 4:30 that afternoon. They went out to Ford's car and he explained that he wanted to buy some cocaine from her on credit. She told him to come back the following night. Ford knew that J.T. lived with two male roommates, and since he had never purchased drugs from J.T. in the past, he took a sawed-off shotgun with him for his own protection. When he got to the apartment Sunday night, J.T. did not have the cocaine. Their conversation eventually turned to sex, and J.T. consented to the sexual intercourse which then followed. Ford alleges that there was no evidence to rebut his testimony. Although the State did not present rebuttal evidence after Ford testified, his testimony stood in stark contrast to that of the victim.

Ford concedes that a defendant may be convicted of rape and criminal deviate conduct based on the uncorroborated testimony of the victim. Guajardo v. State (1986), Ind., 496 N.E.2d 1300, 1305. However, Ford maintains, the evidence may be insufficient where the only incriminating evidence is inherently unbelievable, citing Forrester v. State (1982), Ind., 440 N.E.2d 475, 485. In support of his contention that J.T.'s testimony is inherently unbelievable, Ford points out the following facts: she did not call the police, wake up her roommate or go to the hospital immediately after the incident; the police never saw the severed telephone cord; J.T. confided in Ford, telling him that her old boyfriend was a drug dealer and that they both went to Notre Dame; and Ford did not try to conceal his identity, but rather kept in contact with J.T. after the incident. We find none of these arguments persuasive. The victim's actions immediately following the incident are consistent with one who has been traumatized and threatened with physical violence. The fact that the police did not see a severed telephone cord two days after the occurrence is of no moment, nor is the fact that J.T. told Ford some things about her personal life. We would not characterize appearing at J.T.'s kitchen window two days after the incident and later calling her at work to find out why she called the

police as anything more than harassment. Finally, Ford notes that he was acquitted on the burglary charge. Obviously, this has nothing to do with his rape and criminal deviate conduct convictions.

 In reviewing a challenge to the sufficiency of the evidence we neither reweigh the evidence nor judge credibility. We examine only the circumstantial and direct evidence most favorable to the State together with all reasonable inferences to be drawn therefrom. If there is substantial evidence of probative value to support the conclusion the defendant is guilty beyond a reasonable doubt, the verdict will not be set aside on appeal. *Thomas v. State* (1988), Ind., 519 N.E.2d 143, 144–45. The jury heard evidence from both the victim and the defendant in this case; it was their job to resolve the conflicting testimony. We find there was sufficient probative evidence to support Ford's convictions of rape and criminal deviate conduct beyond a reasonable doubt.

The trial court is affirmed.

All Justices concur.